1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| JOSE ANDRES TRUJILLO, | ) | Case No.: 1:13-cv-00392 AWI GSA HC |
| Petitioner, | ) ) | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS |
| v. | ) ) | CORPUS |
| G. J. JANDA, Warden, | ) ) | |
| Respondent. | ) ) | |
| _____ | ) ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on April 29, 2010, of premeditated murder, premeditated attempted murder, shooting at an inhabited dwelling, and discharging a firearm from a motor vehicle.  Petitioner was sentenced to serve an indeterminate term of twenty-five years to life plus two life terms with the possibility of parole.

Petitioner timely filed a notice of appeal.  On September 30, 2011, the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), affirmed the judgment.  Petitioner then filed a petition for review in the California Supreme Court.  On January 11, 2012, the petition was summarily denied.

On March 18, 2013, Petitioner filed a federal habeas petition in this Court.  He subsequently filed a first amended petition on April 1, 2013.  The amended petition presents the following five claims: (1) The evidence was insufficient to support the finding that Petitioner aided, abetted, facilitated, encouraged or assisted the perpetrator; (2) The trial court erred when it misinstructed the jury pursuant to CALCRIM No. 400 that an aider and abettor is "equally guilty" as the actual perpetrator; (3) The trial court erred by failing to instruct the jury with Alternative C to CALCRIM No. 371; (4) The trial court misinstructed the jury on the use of accomplice testimony; and (5) The cumulative effect of the instructional errors violated Petitioner's due process rights.  On June 14, 2013, Respondent filed an answer to the petition.  On September 12, 2013, Petitioner filed a traverse.

## STATEMENT OF FACTS[1]

On the evening of June 23, 2007, victim Rene Puga was standing outside the Tulare Arms apartment complex (the apartment complex) in Shafter talking with his friends, Eric Rodriguez and Juan Barrios. Rodriguez lived in one of the apartments. Two additional friends, Alfredo Ayon and Freddie Myhre, drove up in Myhre's green Mercury Cougar (the Cougar) and joined the group. Myhre asked Rodriguez for a gun. Rodriguez, who possessed a sawed-off shotgun, refused to give it to Myhre. Yet, Rodriguez offered to "go with them if they needed a gun." Ayon and Myhre then told Rodriguez they were at a convenience market when appellants pulled up in a vehicle and Jose "shot at them a few times." Sergio Saldivar arrived and joined the group. Barrios heard Saldivar say something about being shot at, either that day or on the day before. Rodriguez, Ayon, and Myhre decided to find appellants. Around 7:00 or 8:00 p.m., they got into the Cougar and headed toward Pedro's house. Rodriguez took his shotgun with him.

Meanwhile, Jose, Pedro and Pedro's girlfriend, Sonia Garza, spent the day together. Sometime after dark, they returned to the apartment where Pedro and Garza resided. They were sitting outside when the Cougar stopped in front of a nearby alley. Rodriguez jumped out of the car. He pointed the shotgun toward appellants and walked toward them. Rodriguez hit Pedro several times in the head with the shotgun. Jose stabbed Rodriguez in the right armpit and Rodriguez dropped the gun. When Rodriguez bent to retrieve the gun, Jose stabbed him in the left torso. Pedro fell on the ground and Rodriguez hit him with the shotgun. Ayon and Myhre got out of the car. Ayon tried to hit Pedro but Garza pushed him away. Garza went inside the apartment to protect her children. Hearing police sirens, Rodriguez, Ayon and Myhre got back into the Cougar and drove back to the apartment complex.

Rodriguez was bleeding profusely from his stab wounds and Ayon was injured. Rodriguez hid his shotgun inside his apartment. Then the three men and Rodriguez's girlfriend got back into the Cougar and headed for the hospital. On the way Myhre was involved in a high-speed police chase. Consequently, Rodriguez arrived at the hospital by ambulance. Rodriguez required surgery to treat a stab wound to his upper left abdomen which punctured his diaphragm and stomach.

---

[1] The Fifth DCA's summary of the facts in its September 30, 2011, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

After Rodriguez and his associates drove away, Pedro and Jose cleaned up from the fight. Then they got into Garza's red Isuzu Trooper (the Isuzu) and drove to the apartment complex. Pedro drove and Jose sat in the front passenger seat. Barrios and several other people, including Puga and victims Valerie Leyva and Josefa Villareal, were socializing in front of the apartments. Rodriguez's father, Raul Rodriguez (Raul), was present inside his truck.

Pedro drove by the apartment complex twice and stopped the second time. Jose looked over at the crowd of people. Jose leaned backwards as Pedro leaned forward across Jose and pointed a semi-automatic handgun out the open passenger window. Pedro fired five to seven shots through the open window into the crowd and then drove away. Barrios testified Pedro was the shooter and Jose was the passenger. Raul identified Pedro as the shooter but he could not identify the passenger. Both Barrios and Raul identified the vehicle as a red sports utility vehicle. Raul had seen Pedro driving this same vehicle once before. Raul followed the Isuzu as it drove away but he did not catch up to it because his daughter-in-law had jumped in the truck's bed and, after he stopped to let her into the truck's cab, she convinced him to go to the hospital to see his injured son.

Puga suffered two gunshot wounds, including a fatal shot to the chest and died at the scene. Leyva was shot in the left leg and required two surgeries to repair damage to her knee. Villareal was shot in the right calf and the resulting wound required stitches.

At some point later in the evening Antonio Trujillo, who is one of Pedro's nephews and one of Jose's cousins, drove appellants from a relative's house to a cemetery in Shafter. He was gone about 20 minutes. Soon after he returned, he heard sirens and saw something burning in the orchards. It was Garza's Isuzu.

In mid-August of 2007, appellants were arrested in Canada after they sought work permits. It appeared to a Canadian border control officer that appellants had been illegally working in Canada for about a month.

At the time of the drive-by shooting, Pedro, Jose and Rodriguez were members of a Surenos affiliated gang named Varrio West Side (VWS). Barrios thought Puga was a VWS member. VWS was the only gang in Shafter and members of the gang fought each other as an everyday occurrence. Barrios denied being a member of VWS but acknowledged that he asked to be placed in protective custody rather than to be housed with Nortenos in jail. Barrios testified that if someone does something disrespectful to a gang member, that person must retaliate even if it is against someone else who was simply associated with the person who was disrespectful. Barrios testified the Mexican Mafia had placed a ban on drive-by shootings punishable by death.

Jose testified in his own defense. He admitted being a Sureno gang member and said that in June 2007 gang leadership placed a ban on drive-by shootings that was punishable by death. Jose testified that on the day the drive-by shooting occurred, Rodriguez attacked Pedro and he stabbed Rodriguez to protect his uncle. Jose said he was armed with a knife because there was a power struggle going on in VWS and "[e]verybody's fighting against each other." Jose testified that after Rodriguez and the other attackers drove away, he and Pedro went into Pedro's apartment and tended their wounds. Then Pedro drove him in the Isuzu to his grandmother's house. Jose testified that when they arrived at his grandmother's house, he told two "young guys" who used the monikers "Sapo" and "Sporty" about the fight. Jose did not know Sapo's or Sporty's legal names or addresses. Sapo and Sporty asked for the keys to the Isuzu and Pedro replied that the keys were in the car. Sapo and Sporty got into the Isuzu and drove away. Jose testified that he was listening to a police scanner when he heard there had been a shooting on Tulare Avenue. Then he heard the police broadcast his name and Pedro's name plus their monikers as being wanted in connection with a shooting. The police also broadcasted the name and moniker of Jose's brother, Jose Antonio Trujillo (Pineda). He and

3

1
2
3

Pedro decided to leave the area. A relative drove them to a cemetery and they got a ride to Wasco. On the following morning, Jose heard on the police scanner that he and Pedro were wanted in connection with "the murder." They stole a car, headed north and eventually crossed illegally into Canada by walking through a fenceless field.

4
5
6

In rebuttal, Shafter police dispatcher Sheila McCaleb testified she was on duty on the night of the shooting. She is trained to listen to all radio traffic. When officers arrive at a crime scene they call her and she immediately enters information into a computer, and the information is printed out in a "CAD report." The CAD report for the drive-by shooting does not contain a suspect's name and she does not recall any officer providing her with a name of a suspect on the evening of the shooting.

7

(LD[2] 64.)

8

## DISCUSSION

9

I.      Jurisdiction

10

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to

11

the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the

12

United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375

13

(2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

14

Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located

15

within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

16

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

17

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

18

<u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en

19

banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by

20

its provisions.

21

II.      Standard of Review

22

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

23

unless a petitioner can show that the state court's adjudication of his claim:

24

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

25
26

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

27

28

---

[2] "LD" refers to the documents lodged by Respondent with the response.

1  28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

2  (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

3        As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal

4  law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71 (quoting 28

5  U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look

6  to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

7  relevant state-court decision."  Williams, 592 U.S. at 412.  "In other words, 'clearly established Federal

8  law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

9  the time the state court renders its decision."  Id.  In addition, the Supreme Court decision must

10  "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a

11  new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is

12  no clearly established Federal law for purposes of review under AEDPA.  Moses v. Payne, 555 F.3d

13  742, 754 (9th Cir.2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v.

14  Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established

15  Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision.

16  Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

17        If the Court determines there is governing clearly established Federal law, the Court must then

18  consider whether the state court's decision was "contrary to, or involved an unreasonable application

19  of," [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)).

20  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a

21  conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

22  decides a case differently than [the] Court has on a set of materially indistinguishable facts."

23  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly

24  understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"

25  Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)).  "A

26  state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the

27  state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  Id.  If

28  the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision

1   is reviewed under the pre-AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th

2   Cir.2008) (en banc).

3          "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

4   state court identifies the correct governing legal principle from [the] Court's decisions but

5   unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

6   "[A] federal court may not issue the writ simply because the court concludes in its independent

7   judgment that the relevant state court decision applied clearly established federal law erroneously or

8   incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; see also Lockyer, 538

9   U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists could disagree

10  that the state court's decision conflicts with [the Supreme Court's] precedents."  Harrington, 131 S.Ct.

11  at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state

12  courts decision, the decision cannot be considered unreasonable.  Id.  If the Court determines that the

13  state court decision is objectively unreasonable, and the error is not structural, habeas relief is

14  nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v.

15  Abrahamson, 507 U.S. 619, 637 (1993).

16          Petitioner has the burden of establishing that the decision of the state court is contrary to or

17  involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94

18  F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth

19  Circuit precedent remains relevant persuasive authority in determining whether a state court decision

20  is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v.

21  Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

22          AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1) is

23  limited to the record that was before the state court that adjudicated the claim on the merits," and

24  "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __

25  U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed

26  correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340

27  (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a state court factual finding is not entitled to

28  deference if the relevant state court record is unavailable for the federal court to review.  Townsend v.

1  Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

2  III.     Review of Claims

3       A.  Sufficiency of the Evidence

4       Petitioner first claims the evidence was insufficient to support the finding that he aided,

5  abetted, facilitated, encouraged or assisted the perpetrator in the commission of murder, attempted

6  murder, or intentional discharge of a weapon.

7       This claim was first presented on direct appeal to the Fifth DCA.  The claim was denied in a

8  reasoned decision on September 30, 2011.  He then raised the claim to the California Supreme Court

9  in a petition for review.  The petition was denied without comment.  When the California Supreme

10  Court's opinion is summary in nature, the Court must "look through" that decision to a court below

11  that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The

12  appellate court analyzed and rejected the claims as follows:

13  **A. The guilty verdicts pertaining to Jose are supported by substantial evidence.**

14       We begin by addressing Jose's challenge to the sufficiency of the evidence
    supporting his convictions on the substantive offenses. Jose was held liable as an aider
15  and abettor; there was no evidence presented that he personally fired the shots into the
    crowd. Jose concedes "he may have shared the principal's homicidal intent." Yet, he
16  insists that his presence in the Isuzu coupled with his act of leaning backwards when
    Pedro leaned forward and fired through the Isuzu's open passenger window, together
17  with reasonable inferences that can be drawn from this evidence, are inadequate to
    prove he facilitated or encouraged the substantive crimes. We are not convinced. As
18  will be explained, the guilty verdicts are supported by substantial evidence and Jose's
    challenge to his convictions lacks merit.

19  **1. We apply the substantial evidence standard of review.**

20       The applicable standard of review is axiomatic. When assessing a state law
21  challenge to the sufficiency of the evidence, the appellate court examines the entire
    record in the light most favorable to the judgment below to determine whether it
22  contains substantial evidence from which a reasonable trier of fact could find the
    defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557,
23  578.) The same standard applies when assessing a federal constitutional due process
    claim: "[T]he critical inquiry on review of the sufficiency of the evidence to support a
24  criminal conviction must be not simply to determine whether the jury was properly
    instructed, but to determine whether the record evidence could reasonably support a
25  finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307,
    318, fn. omitted.) "The standard is the same, regardless of whether the prosecution
26  relies mainly on direct or circumstantial evidence. [Citation.]" (*People v. Vazquez*
    (2009) 178 Cal.App.4th 347, 352.) Generally, the testimony of a single witness is
27  sufficient to prove a disputed fact unless the testimony is inherently improbable or
    physically impossible. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; *People v. Scott*
28  (1978) 21 Cal.3d 284, 296.) The trier of fact makes credibility determinations and

7

resolves factual disputes. (*People v. Estrella* (1995) 31 Cal.App.4th 716, 724–725.) An appellate court will not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Vazquez, supra,* 178 Cal.App.4th at p. 352.) "'Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it.' [Citation.]" (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245; see also *Jackson v. Virginia, supra,* 443 U.S. at p. 319.)

**2. The legal principles of aider and abettor liability are well established.**

"All persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense, or aid and abet in its commission ... are principals in any crime so committed." (§ 31.) Principals to a crime are sometimes described as falling into one of two categories—a perpetrator (sometimes called an actual perpetrator or a direct perpetrator), or an aider and abettor. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122–1123.) "Accomplice liability is 'derivative,' that is, it results from an act by the perpetrator to which the accomplice contributed." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Yet, as a principal in the crime, an aider and abettor "shares the guilt of the actual perpetrator." (*Ibid*.)

"Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. [Citations.] This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something and have a certain mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) "The mental state necessary for conviction as an aider and abettor, however, is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged.... An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.] The jury must find 'the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense....' [Citations.]" (*People v. Mendoza, supra,* 18 Cal.4th at pp. 1122–1123.)

**3. There is substantial evidence proving Jose aided and abetted the commission of the substantive crimes.**

In this case, Barrios and Raul Rodriguez identified Pedro as the shooter. Thus, he is the actual perpetrator. Having examined the entire record, we find ample evidence from which a jury could conclude beyond a reasonable doubt that Jose aided and abetted in the commission of the drive-by shooting that resulted in the commission of counts 1 through 9 with the requisite intent. We agree with respondent that in challenging the sufficiency of the evidence, Jose has erroneously isolated his conduct inside the Isuzu at the moment the shooting occurred from the surrounding circumstances before and after the drive-by shooting.

The record contains evidence proving much more than Jose's mere presence inside the Isuzu. A few hours before the drive-by shooting Ayon and Myhre told Rodriguez they were at a convenience market when appellants pulled up in a vehicle and Jose had shot at them a few times. A short time later, both Jose and Pedro were

attacked. Jose stabbed Rodriguez in the ensuing fracas. Jose was armed with a knife prior to the drive-by shooting and used deadly force during the fight with Rodriguez. Jose admitted that he was a Sureno gang member and Barrios testified about the importance of respect in the gang culture. Thus, a jury could reasonably find Jose and Pedro decided to commit the drive-by shooting in revenge for the attack. After the attackers fled, appellants drove together to the apartment complex where Rodriguez lived. Then Pedro slowly drove by the apartments. It can reasonably be inferred that both Pedro and Jose surveilled the immediate area during this slow pass. Then Pedro drove back and stopped in front of the entrance to the complex. Jose turned his head and looked at the intended victims. Then Jose leaned backwards so Pedro had a clear line of fire out the passenger window. Pedro then drove in front of the apartments and stopped. At this point, Jose turned toward the crowd and stared at the intended victims. Then he leaned back so Pedro had a clear line of fire. Both of these actions are significant—by staring at the victims Jose surveyed the crowd in front of the complex, called attention to himself and directed the crowd's attention to the Isuzu. By moving backwards in his seat, Jose provided Pedro with an unobstructed line of fire into the crowd. This increased the probability that Pedro would hit his targets. Jose did not evidence any surprise or shock, as one would normally do if one was surprised by a sudden appearance of a gun being thrust across your body. One can reasonably infer from the entirety of this evidence that Jose knew Pedro was going to shoot at the crowd when the Isuzu stopped in front of the complex. After the drive-by shooting Jose and Pedro jointly fled to Canada.

From the entirety of this evidence a reasonable fact finder could infer that Jose aided and abetted the drive-by shooting. Jose and Pedro's concerted actions before, during and after the drive-by shooting reasonably imply the existence of a common purpose. A jury reasonably could have concluded that Pedro possessed the intent to kill and that Jose, with the knowledge of Pedro's intent to kill and for the purpose of assisting him in carrying out that intent, accompanied Pedro to the scene of the shooting, surveilled the area, acted as look-out and back-up during the shooting and escaped with Pedro to Canada. The evidence also supports a finding that Jose personally possessed the intent to kill Puga and the other people in the crowd, including Leyva and Villareal.

Appellate courts have upheld aider and abettor liability in similar situations. In *People v. Chagolla* (1983) 144 Cal.App.3d 422, the three codefendants committed a drive-by shooting after cruising the area for two hours. One of the defendants, Ronald Chagolla, leaned out the passenger window and shouted a gang slogan during one pass in front of the shooting site. His brother, Edward Chagolla, was the shooter. The appellate court upheld Ronald's convictions for aiding and abetting the drive-by shooting, reasoning:

"... It would be farcical for Ronald to contend he was in an automobile with his brother and others for over two hours cruising the area with his brother pointing a gun at others and be oblivious of what was going on. Ronald's conduct and the other circumstances indicating his participation belie this contention. The automobile being a Chevrolet, Ronald would have to have been the General Motor's test dummy to avoid gathering knowledge as to the events about to occur.... The jury could reasonably deduce from direct and circumstantial evidence that Ronald knew Edward was armed with a rifle, knew Edward intended to do the shooting and both directly and indirectly rendered support and encouragement to his brother Edward in the commission of the offense." (*People v. Chagolla, supra*, 144 Cal.App.3d at p. 429.)

And in *People v. Campbell* (1994) 25 Cal.App.4th 402, defendant Smith's convictions for aiding and abetting an attempted robbery and attempted murder were

9

upheld based on his presence during the robbery and postoffense conduct. During the robbery, codefendant Campbell produced a handgun and aimed it at the victim. On appeal, Smith claimed the evidence only showed he was present when Smith attempted to rob the victim. This contention was decisively rejected. The court pointed out that Smith was not surprised by Campbell's conduct or afraid to interfere with it. It found that "[t]heir concerted action reasonably implies a common purpose" and that the jury could find Smith's act of standing in front of the victims was intended "to intimidate and block them, divert suspicion, and watch out for others who might approach. Such conduct is a textbook example of aiding and abetting." (*Id*. at p. 409.)

In challenging the sufficiency of the evidence, Jose heavily relies on *Juan H. v. Allen* (2005) 408 F.3d 1262 (*Juan H.*). In *Juan H.,* the Ninth Circuit Court of Appeals reversed a juvenile court adjudication for murder based on an aiding and abetting theory. Petitioner, who was 14 at the time of the homicide, stood behind his older brother who suddenly drew a gun from his pants and fired it at the victim. After the shooting, the petitioner ran home while his brother ran to his car and drove away. The federal appeals court found the absence of any evidence indicating that petitioner said or did anything from which one could reasonably conclude he knew of his brother's homicidal intent to be determinative. It reasoned that petitioner's knowledge that his brother was armed, without more, did not permit a rational inference that he knew his brother would, without provocation, assault or murder the victims. (*Id*. at pp. 1276–1279.)

*Juan H*. is readily distinguishable. In this case, there is evidence of concerted effort between Jose and Pedro before, during and after the drive-by shooting that was not present in *Juan H*. After a violent fight in which Jose used deadly force, Jose and Pedro drove to the apartment complex where the chief instigator of the fight lived. Once at the complex, Jose stared at the victims and moved out of the way so Pedro had a clear line of fire. Then Jose and Pedro fled the country together. In *Juan H*., the petitioner did not flee the area with his brother and there was no evidence of a concerted effort between petitioner and his brother. Therefore, *Juan H*. is inapposite.

In sum, we hold that the trial evidence and reasonable inferences that may be derived from it support a finding that Jose aided and abetted Pedro in the commission of the drive-by shooting. With the knowledge of Pedro's homicidal intent and for the purpose of assisting him in carrying out that intent, Jose accompanied Pedro to the apartment complex where Rodriguez lived, acted as a look-out during the shooting and fled with Pedro to Canada to avoid apprehension. The evidence also supports a finding that Jose personally possessed the intent to kill and that he premeditated the murder and attempted murders. We, therefore, reject Jose's challenge to the sufficiency of the evidence and find the convictions on counts 1 through 9 did not infringe any of Jose's state or federal constitutional rights. (*People v. Chagolla, supra*, 144 Cal.App.3d at p. 429; *People v. Campbell, supra*, 25 Cal.App.4th at p. 409.)

(LD 64.)

The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal

1   habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v.

2   Allen, 408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision was

3   an unreasonable application of the Jackson standard.

4   　　　In the petition and traverse, Petitioner focuses on his sole act of leaning backward in his

5   vehicle.  He complains that his presence in the vehicle and his single act of leaning backward were

6   insufficient to demonstrate he acted to facilitate or encourage the substantive crimes committed by his

7   co-defendant.  His arguments are not well-taken.  As noted by the state court, it was not only

8   Petitioner's actions of being in the car and leaning back that manifested an intent to facilitate the

9   crimes.  There were many other acts from which a rational trier of fact could so conclude.  Petitioner

10  and his co-defendant were involved in a previous fight in which Petitioner used deadly force.  They

11  then acted in concert in traveling to the apartment complex where the main instigator of the fight lived.

12  Once there, Petitioner stared the victims down, and then moved out of the way so that his co-defendant

13  had a clear line of fire.  After the commission of the offense, Petitioner and his co-defendant fled

14  together to Canada.  In light of these acts, the state court's finding that sufficient evidence supported

15  Petitioner's conviction for aiding and abetting was not unreasonable.  The claim should be rejected.

16  　　　B.  Jury Instruction - CALCRIM No. 400

17  　　　Petitioner next alleges the trial court erred when it instructed the jury with CALCRIM No. 400.

18  This claim was also presented on direct appeal to the Fifth DCA where it was denied in a reasoned

19  decision on September 30, 2011.  He then raised the claim to the California Supreme Court in a

20  petition for review.  The petition was denied without comment.  When the California Supreme Court's

21  opinion is summary in nature, the Court must "look through" that decision to a court below that has

22  issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The appellate

23  court analyzed and rejected the claims as follows:

24  　　　　　　**B. Any error associated with CALCRIM No. 400 is harmless.**

25  　　　　　We next resolve Jose's contention that the court erred by instructing on aider
26  　　and abettor liability with CALCRIM No. 400 which, at the time of appellants' trial,
    　　contained a sentence reading: "A person is equally guilty of the crime whether he or
    　　she committed it personally or aided and abetted the perpetrator who committed it."
27  　　Jose argues this sentence improperly ties the aider and abettor's mental state to that of
    　　the perpetrator's, thereby lowering the People's burden of proof. After carefully
28  　　examining the record, we conclude the asserted instructional error is harmless beyond a

11

reasonable doubt and reject Jose's argument for this reason.

**1. An aider and abettor's mens rea is personal.**

In *McCoy, supra*, 25 Cal.4th 1111, the California Supreme Court held an aider and abettor sometimes "may be guilty of greater homicide-related offenses than those the actual perpetrator committed." (*Id*. at p. 1114.)

In *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), the Second District Court of Appeal examined McCoy's reasoning and determined that, while our Supreme Court did not expressly hold that an aider and abettor may be guilty of lesser homicide-related offenses than those committed by the actual perpetrators, it "nonetheless suggests it." (*Id*. at p. 513.) The *Nero* court explained that *McCoy's* holding was based on the premise that one person's mens rea may not always be equal to another person's. (*Id*. at p. 514.) The aider and abettor is liable for his owns mens rea. Guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state. An aider and abettor's mens rea is personal, and may be different than the direct perpetrator's mens rea. (*Ibid*.) After explaining *McCoy's* reasoning, the *Nero* court examined the pattern instructions on aider and abettor liability. It determined, in relevant part, that "even in unexceptional circumstances," CALCRIM No. 400 "can be misleading." (*Id*. at p. 518.) *Nero* characterized the pattern instructions on aider and abettor as confusing and suggested they be modified. (*Ibid*.)

*Nero's* suggestion concerning modification of the pattern instructions was adopted by the Judicial Council of California. In April 2010, CALCRIM No. 400 was rewritten and the problematic phrase "equally guilty" was eliminated. CALCRIM No. 400 now provides, in relevant part: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." The bench notes to CALCRIM No. 400 currently provide, in relevant part: "An aider and abettor may be found guilty of a different crime or degree of crime than the perpetrator if the aider and abettor and the perpetrator do not have the same mental state. [Citations.]" (Judicial Council of Cal.Crim. Jury Instns. (2011) Bench Notes to CALCRIM No. 400, p. 167.)

**2. The asserted misinstruction is harmless beyond a reasonable doubt.**

The applicable test for assessing prejudice in this instance is the Chapman standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*); *Nero, supra*, 181 Cal.App .4th at pp. 518–519.) "Under that test, an appellate court may find the error harmless only if it determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. [Citation.]" (*Samaniego, supra*, 172 Cal.App.4th at p. 1165.) After examining the record in this case, we are convinced that inclusion of CALCRIM No. 400 in the jury charge did not contribute to the verdict.

In *Samaniego, supra*, 172 Cal.App.4th 1148, the appellate court determined that while CALCRIM No. 400 was misleading as applied, the instructional error was harmless. In that case, the three appellants participated in a drive-by shooting but the identity of the actual shooter was unknown. (*Id*. at p. 1166.) The jury found them all guilty of murder and found a multiple-murder special circumstance true. The *Samaniego* court reasoned that the verdicts demonstrate that "[t]he jury necessarily found that appellants acted willfully with intent to kill." (*Id*. at p. 1165.) Also, it "necessarily found that appellants acted deliberately and with premeditation." (*Ibid*.) It reasoned, "It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*Id*. at p. 1166 .)

Here, the verdicts affirmatively demonstrate that the jury did not erroneously believe it had to return identical verdicts for both appellants. The jury found the special circumstance and firearm enhancement allegations true as to Pedro but not true as to Jose. Also, there is no indication in the record that the jury was confused on the question of aider and abettor liability. Nothing suggests that the jury wanted to acquit Jose of some offenses or find him guilty of lesser included offenses but erroneously believed that it could not do so if it found Pedro guilty as charged. Therefore, even if we were to find the disputed phrase "equally guilty" to be ambiguous or misleading, it was not understood by the jury as a direction to find the appellants equally culpable.

Also, error in instructing the jury on lesser forms of culpability is harmless when it can be shown that the jury properly resolved the question under the instructions, as given. (*People v. Hart* (2009) 176 Cal.App.4th 662, 673–674.) Here, the jury resolved the question of Jose's mens rea (i.e., his intent to kill) adverse to him when it convicted him of attempted murder (counts 2 and 3) and found the premeditation allegations to be true. *People v. Lee* (2003) 31 Cal.4th 613, explained that "the person guilty of attempted murder as an aider and abettor must intend to kill." (*Id.* at p. 624; *see also Samaniego, supra*, 172 Cal.App.4th at p. 1166.) The jury was instructed that it could find Jose guilty of murder and attempted murder only if the prosecutor proved beyond a reasonable doubt that he specifically intended to, and in fact did, aid and abet Pedro in committing those crimes. And it was informed that one "acted with premeditation if he decided to kill before committing the act that caused death." Juries are presumed to follow the instructions given. (*People v. Pinholster* (1992) 1 Cal.4th 865, 919, overruled on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Jose argues the prosecutor compounded the asserted instructional error when he stated during closing arguments that "[t]he law states that a person is equally guilty if they help someone commit a crime" and "a person is equally guilty if they help someone commit a crime, no matter the extent or manner of their participation." The quoted sentences must be considered in context. The prosecutor was explaining general concepts surrounding aiding and abetting. He did not argue that the jury was required to find Jose guilty of the exact same crimes it found Pedro committed. Rather, he argued that if Jose was not the shooter but he helped Pedro commit the shooting, then Jose is equally liable for the crimes. The prosecutor's argument was not legally objectionable and did not magnify the effect of the claimed instructional error.

For all of these reasons, we conclude "beyond a reasonable doubt that the jury verdict would have been the same absent the error." (*Samaniego, supra*, 172 Cal.App.4th at p. 1165.) There does not exist a reasonable possibility that the jury would have returned a more favorable verdict if the phrase "equally guilty" had been omitted from CALCRIM No. 400. We, therefore, conclude the alleged instructional error was harmless and reject Jose's challenge to CALCRIM No. 400 for this reason.

(LD 64.)

Petitioner claims the state court erred in instructing the jury in violation of his due process rights. The Supreme Court has held that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991) (citing Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983)) ("[T]he Due Process Clause does not permit the federal

13

courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). Federal habeas courts therefore do not grant relief simply because an instruction may have been deficient. Estelle, 502 U.S. at 72. The only question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72; Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, *supra*, 414 U.S. at 147). In addition, juries are presumed to have followed their instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). And in reviewing the instruction, the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990). Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner's suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In this case as set forth above, the state court determined that the instruction could be problematic in some cases; however, any error in this case was harmless beyond a reasonable doubt. The verdicts returned in this case demonstrated that the jury did not believe it had to find Petitioner and his co-defendant equally guilty. As noted by the state court, the jury found the special circumstance and firearm enhancement allegations true as to the co-defendant but not true as to Petitioner. Indeed, Petitioner admits in his traverse that the jury "exercised . . . independent discretion" and "acquitted petitioner of some counts they convicted the crime partner for," and "[i]t is obvious the jury viewed their culpabilities differently." (See Traverse at 6.) In addition, there is nothing in the record to suggest the jury was confused on aider and abettor liability. Also, the jury resolved the question of Petitioner's mens rea, i.e., his intent to kill, when it found him guilty of attempted murder and found the premeditation allegations to be true. Therefore, the state court

reasonably determined that the instruction was not applied in a way that violated the Constitution. And even if the error could be considered constitutional instructional error, it did not have a substantial and injurious effect or influence in determining the verdict.  The claim should be rejected.

### C.  Jury Instruction – CALCRIM No. 371

In his next claim for relief, Petitioner contends the trial court misinstructed the jury using only Alternative A to CALCRIM No. 371.[3]  He argues that the jury should have been instructed as well with Alternative C.  The failure to do so, he claims, allowed the jury to consider the testimony of witness Barrios against Petitioner absent evidence that Petitioner knew and approved of third party suppression efforts.

Respondent correctly argues that only a state law basis for this claim was presented to the California Supreme Court.  Therefore, any federal basis for the claim is unexhausted, and ordinarily, the claim must be dismissed.  See 28 U.S.C. § 2254(b)(1).  In addition, the claim as presented here does not allege a violation of the Constitution or federal law.  Petitioner does not allege that the adjudication of his claims in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, . . . or resulted in a decision that was

---

[3]CALCRIM No. 371 provides:

Consciousness of Guilt: Suppression and Fabrication of Evidence

*<Alternative A—suppression>*

[If the defendant tried to hide evidence or discourage someone from testifying against (him/her), that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.]

*<Alternative B—fabrication>*

[If the defendant tried to create false evidence or obtain false testimony, that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.]

*<Alternative C—fabrication or suppression by a third party>*

[If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of (his/her) guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself.]

based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254.  The claim is entirely based on the interpretation and application of state law, and such issues of state law are not cognizable on federal habeas.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").  In addition, "the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution."  Sawyer v. Smith, 497 U.S. 227, 239 (1990) (quoting Dugger v. Adams, 489 U.S. 401, 409 (1989)).  "It is beyond dispute that we do not hold a supervisory power over the courts of the several States."  Sanchez-Llamas v. Oregon, 548 U.S. 331, 345 (2006).  Federal courts are bound by state court rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.1989).

Nevertheless, even if the claim presented a federal question, it would be meritless.  The state court rejected the claim as follows:

**A. Failure to instruct sua sponte on witness dissuasion was not error.**

At the prosecutor's request, the court gave CALCRIM No. 371, "Alternative A" (alternative A), which instructs on suppression or destruction of evidence as proof of consciousness of guilt. Jose argues the court erred by failing to give, sua sponte, CALCRIM No. 371, "Alternative C" (alternative C), which instructs on suppression of evidence by a third party as proof of consciousness of guilt. Jose also argues defense counsel was ineffective because he failed to request this instruction. Pedro joins in these arguments. As will be explained, the court did not have a sua sponte duty to give alternative C and defense counsel was not ineffective.

**1. Facts.**

**a. Trial testimony pertaining to destruction or suppression of evidence.**

Evidence was presented showing that the Izuzu was burned within a few hours after the drive-by shooting occurred.

In relevant part, Barrios testified that he was in custody because he failed to appear as a witness in this case. He explained that he felt threatened by members of appellants' family on two occasions. Once, he failed to appear and testify because he felt threatened when he saw appellants' relatives. On another occasion, he and Pineda were both in jail. Pineda confronted him and made a hand motion indicating Barrios would be killed if he testified against appellants.

Although   neither   appellant   objected   to   Barrios's   testimony   about   being

16

threatened, the court informed counsel outside the presence of the jury that it had allowed this testimony because it was relevant to Barrios's credibility and "[t]here is no requirement that the threats be corroborated or that the witness' fear of retaliation be directly linked to the defendant for the threat to be admissible." Then the court stated, "If counsel wishes a limiting instruction, kindly prepare one." Pedro's attorney replied "No, your Honor, at this time, at least on behalf of Pedro Trujillo, I think the Court has summarized the law correctly, at least the law as I understood it on this point." Jose's counsel did not reply. Neither Pedro nor Jose submitted a proposed limiting instruction. Deputy Jeffrey Stockton, a detention officer at the Lerdo jail facility, testified that he saw Barrios and Pineda standing face to face in the middle of a cell on January 7, 2010. It was clear to the deputy "that the two of them were having a verbal confrontation" but the deputy did not hear what the two men said to each other. After the deputy separated them, Barrios told him that he was going to testify against Pineda's brother.

Jose's brother Pineda was called as a defense witness. In relevant part, he testified that he confronted Barrios when they were in jail together. Pineda said that he asked Barrios why Barrios told people that he killed Puga. Barrios did not reply.

### b. Trial proceedings relating to CALCRIM No. 371.

Neither Jose nor Pedro requested any instruction on the topic of suppression of evidence or dissuading a witness. The prosecutor requested CALCRIM No. 371, alternative A. Alternative A, was discussed during one of the instructional conferences. The court stated that it would cross out a phrase in alternative A pertaining to discouraging someone from testifying because there was no evidence that the defendants attempted to discourage a witness from testifying. The court stated, "The only possibility might be the apprehension of Mr. Barrios, but I don't think ... this would apply to that. [¶] ... [¶] And I don't think you have any direct link that either defendant—"The prosecutor interrupted, stating "Right, I don't." The court continued, "But I think you need to give this as a cautionary instruction." Then the court stated it would excise the portion of alternative A relating to a defendant's act of authorizing another person to hide or destroy evidence. The prosecutor agreed that there was "no evidence of authorizing another person to hide or destroy." At this point, Pedro's counsel asked, "What evidence is [the prosecutor] talking about?" The prosecutor replied, "The destruction of the vehicle." Pedro's counsel responded, "Oh, that's a pretty good example, yes." Then Pedro's counsel asked, "Are we crossing out alternative B, then?" The court and the prosecutor replied, "Yes." Then the court asked, "[Alternatives] B and C, right?" The prosecutor replied, "Yes." Jose's counsel did not make any comments during the discussion of CALCRIM No. 371.

As part of its closing instructions, the court gave alternative A, as modified during the instructional conference: "If the defendant tried to hide and/or destroy evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. If you conclude that a defendant tried to hide and/or destroy evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether the other defendant is guilty or not guilty."

### 2. The court did not refuse to give alternative C or another limiting instruction pertaining to testimony that Barrios felt threatened.

Jose asserts "by the time of the jury instruction conference, the court itself decided that Barrios' testimony did not support the 'Alternative C' option in [CALCRIM No. 371], and told the parties it would not be so instructing." Jose has

misinterpreted the court's comments during the instructional conference.

The prosecutor requested alternative A because there was evidence that someone burned the Izuzu after the drive-by shooting. During the instructional conference, the court carefully examined the language of alternative A. The court stated that the phrase "discourag[ing] someone from testifying" contained in alternative A must be crossed out because it was not applicable. During discussion of alternative A, the court mentioned that Barrios's testimony about feeling threatened might be a "possibility" but then the court and the prosecutor both agreed that the phrase didn't apply because there was no direct link between the threats and the defendants. When the court stated that "you need to give this as a cautionary instruction," it was referring to alternative A. At no time during this discussion did the court consider if alternative C might apply to Barrios's testimony about feeling threatened. Neither Pedro nor Jose asked for alternative C or another limiting instruction relating to witness dissuasion. The possible applicability of alternative C was not considered by the parties or the court at any time below. We, therefore, reject Jose's assertion that the trial court consciously decided not to give alternative C.

**3. The trial court did not have a sua sponte duty to give alternative C.**

It is an accepted legal principal that, "Trial courts generally have no duty to instruct on the limited admissibility of evidence in the absence of a request. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1020.) In *People v. Najera* (2008) 43 Cal.4th 1132, our Supreme Court explained:

"Where ... an instruction simply informs the jury that a fact or cluster of facts is not, without more, substantial evidence of guilt under the ordinary legal rules set forth elsewhere in the instructions, we have not imposed a duty on trial courts to provide such an instruction sua sponte. For example, the instructions concerning consciousness of guilt ... recite that such evidence is not sufficient by itself to prove guilt, yet we have never held that the trial court has a sua sponte duty to instruct the jury accordingly. (See Judicial Council of Cal.Crim. Jury Instns. (Fall 2007) Bench Notes to CALCRIM No. 371 ['No authority imposes a duty to give this instruction sua sponte'].) ... Such instructions, while helpful in various circumstances, are not vital to the jury's ability to analyze the evidence and therefore are not instructions that must be given to the jury even in the absence of a request." (*People v. Najera, supra*, 43 Cal.4th at p. 1139, fns. omitted.)

Jose argues that if alternative C had been given sua sponte, then the jury would have determined that it could not consider Barrios's testimony about feeling threatened as proof of consciousness of guilt because there was no evidence linking appellants to the threats. We reject this claim because it is essentially a convoluted argument that a limiting instruction should have been given informing the jury that Barrios's testimony he felt threatened was admissible solely on the issue of Barrios's credibility. The record reflects that at the time Barrios testified about the threats, the court told the appellants to submit a limiting instruction if they wanted one. Pedro's counsel expressly refused such an instruction and Jose was silent. Neither appellant requested alternative C or another limiting instruction informing the jury that evidence Barrios felt threatened was admissible solely for credibility. Absent a request, the trial court did not have a sua sponte obligation to give such an instruction. (*People v. Najera, supra*, 43 Cal.4th at p. 1139.)

Jose's argument that the facts of this case are so extraordinary that a sua sponte instructional duty existed despite the general rule to the contrary is unconvincing. Barrios did not state either appellant directed or approved of the threats. There was

1  nothing linking appellants to these threats. Barrios's testimony about the threats was not
2  so inherently prejudicial or deeply shocking that it excuses appellants from the general
   rule requiring a request for a limiting instruction.

3       Jose also argues he was excused from requesting alternative C because it would
4  have been explained, the trial court did not decide that it would not give
5  alternative C. No party indicated any interest in alternative C during the instructional
   conference. The trial court did not consider whether alternative C should be given
6  because neither defendant requested alternative C or mentioned it. The court simply
7  found that Barrios's testimony about the threats did not fall within the ambit of
   alternative A. It did not consider whether alternative C might apply. Appellants had an
8  affirmative obligation to request an appropriate limiting instruction if they wanted the
   jury instructed that (1) the threat evidence could not properly be considered to prove
9  appellants' consciousness of guilt because there was no evidence linking them to the
10 threats, or (2) the threat evidence could only be considered on the issue of Barrios'
   credibility. Since the court previously offered to give a limiting instruction if appellants
   submitted one, such a request would not have been futile.

11      Accordingly, we conclude the trial court did not have a sua sponte obligation to
12 give alternative C. Since the instruction was not requested by either appellant, the trial
   court did not err by failing to include alternative C in the jury charge.

13 (LD 64 (footnotes omitted).)

14      Respondent first argues that Petitioner has procedurally defaulted on this claim because

15 counsel failed to request a limiting instruction.  See People v. Saunders, 5 Cal.4th 580, 589-90 (1993)

16 (quoting United States v. Olano, 507 U.S. 725, 731 (1993) ("No procedural principle is more familiar

17 to this Court than that a constitutional right, or a right of any other sort, may be forfeited in criminal as

18 well as civil cases by the failure to make timely assertion of the right before a tribunal having

19 jurisdiction to determine it.")

20      A federal court will not review a petitioner's claim if the state court has denied relief of that

21 claim pursuant to a state law that is independent of federal law and adequate to support the judgment.

22 Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30 (1989).

23 A state court's refusal to hear the merits of a claim because of petitioner's failure to follow a state

24 procedural rule is considered a denial of relief on independent and adequate state grounds.  Harris v.

25 Reed, 489 U.S. 255, 260-61 (1989).  Therefore, federal review of Petitioner's claim is barred unless

26 Petitioner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that

27 the failure to consider the claims will result in a fundamental miscarriage of justice.  Noltie v.

28 Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750.  In this case, Petitioner has

not shown that any external factor prevented defense counsel from requesting a limiting instruction. In addition, Petitioner fails to demonstrate actual prejudice resulted from the failure.

Similarly, Petitioner has not demonstrated a fundamental miscarriage of justice will occur if the claim is barred from federal review.  The miscarriage of justice inquiry is governed by the standard set forth in <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).  <u>Murray</u> requires a habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  <u>Id</u>. at 496.  To satisfy <u>Murray's</u> "actual innocence" standard, a petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  <u>Id</u>.  Here, Petitioner makes no such showing of actual innocence.

Accordingly, Petitioner is procedurally barred from bringing this claim. In any case, Petitioner's claim is without merit.  The appellate court reasonably determined that the trial court did not refuse to give Alternative C, and the trial court did not have a sua sponte duty to instruct on the limited admissibility of evidence.  The claim should be denied.

### D.  Jury Instruction – Accomplice Testimony

In his fourth claim, Petitioner joins arguments made by his co-defendant.  However, he only presented one of the arguments raised by his co-defendant to the California Supreme Court.  Accordingly, only the claim concerning misinstruction regarding the use of accomplice testimony is exhausted.  <u>See</u> 28 U.S.C. § 2254(b)(1).  The state court denied the claim as follows:

**B. The court correctly instructed on accomplice corroboration.**

**1. Facts.**

The initial instructional conference was held before Jose testified. The court stated that it did not need to give the portion of CALCRIM No. 301 relating to accomplices because "We didn't have any co-conspirators or accomplices testifying." Pedro's counsel replied, "[T]hat remains to be seen." The court and Pedro's counsel agreed that if a codefendant testified, "[t]hen there has to be separate corroboration."

A second instructional conference was held after Jose testified. During discussion of CALCRIM No. 301, Pedro's counsel argued "to the extent [Jose] is an accomplice, which is what the People view him as, at least under one of their theories, that his status as an accomplice would be the same as a person who is not charged." Jose's counsel agreed with Pedro's counsel on this point. The court asked, "So we would insert, then, in [CALCRIM No.] 301, unless there's an objection, except for the testimony of Jose Trujillo and Tony Pineda?" Both Pedro's counsel and Jose's counsel agreed that the jury should be instructed that the testimony of Jose and Pineda required corroboration.

During a third instructional conference, Pedro's counsel argued that the language of CALCRIM No. 301 "creates potentially the false impression with the jurors that the testimony of [Jose] has to be corroborated with regards to his own case." Pedro's counsel suggested that the court "skip it." The court replied that it had a sua sponte instructional duty. Pedro then stated CALCRIM No. 301 should make clear that corroboration is required only to the extent that the testimony of Jose or Pineda is going to be used against the codefendants. The court replied, "Do a pinpoint." Pedro's counsel replied, "That's fine. If you want to do a pinpoint, that's fine. [¶] And I'm not saying it has to be done in [CALCRIM No.] 301. I'm saying we need to make it clear that we are not emphasizing that these particular witnesses generally require corroboration." The court responded that CALCRIM No. 334 "lays it out." Pedro's counsel next asserted that CALCRIM No. 301 "is misleading to the extent that it does not qualify in what circumstances you have to have corroboration." The court and counsel then discussed various ways CALCRIM No. 301 could be modified to specify that only inculpatory testimony required corroboration. Pedro's counsel specifically asked the court not to identify the potential accomplices in CALCRIM No. 301.

The court and counsel agreed on the following modification of CALCRIM No. 301: "Except for the testimony of an accomplice, which requires supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence. The term accomplice will be defined in a subsequent instruction." The court asked counsel if it had "[a]ny problem with that?" The prosecutor and counsel for both appellants replied in the negative.

The jury was instructed with CALCRIM No. 301, as modified. The jury was also instructed with CALCRIM No. 334, which provided in relevant part:

"Before you may consider the statement or testimony of Jose Trujillo and/or Tony Pineda as evidence against Pedro Trujillo and the statement or testimony of Tony Pineda as evidence against either or both defendants regarding the crimes of first-degree murder and the lesser-included offenses thereto, attempted murder, shooting at an inhabited dwelling house, and/or discharging a firearm from a vehicle, you must decide whether Jose Trujillo and/or Tony Pineda was an accomplice—or were accomplices to those crimes. [¶] A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. [¶] ... [¶] If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness. [¶] If you decide that a declarant or witness was an accomplice, then you may not convict the defendant of any of the above noted charged crimes based on his or her statement or testimony alone. [¶] ... [¶] The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." (Italics added.)

**2. Accomplice instructions were properly given and correctly stated the law.**

Pedro raises several challenges to the accomplice instructions (CALCRIM Nos. 301 and 334). Initially, he argues that accomplice instructions were inapplicable because neither Jose nor Pineda gave any testimony that tended to incriminate Pedro.

Then he argues CALCRIM Nos. 301 and 334 improperly undermined the credibility of key defense witnesses by singling them out for special scrutiny. He contends that if the jurors believed Jose and/or Pineda were accomplices, then they would infer from CALCRIM No. 301 that all of their testimony should be viewed with caution. Pedro also argues to the extent the accomplice instructions were technically correct, they were confusing and contradictory as well as partisan and argumentative. Pedro asserts this alleged instructional error was of constitutional dimension because the accomplice instructions shifted the burden of proof to the defense, violated the presumption of innocence and right to compulsory process. Jose joins in these claims to the extent they benefit him. As will be explained, none of these arguments are convincing.

**C. Accomplice instructions may be given when the accomplice was called as a defense witness.**

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense...." (§ 1111.) It is now settled law that properly tailored accomplice instructions may be given when appropriate regardless whether the prosecution or the defense calls the accomplice as a witness.

In *People v. Williams* (1988) 45 Cal.3d 1268 (*Williams*), the court addressed the trial court's duty to instruct the jurors regarding accomplice testimony: "When an accomplice is called as a witness by the prosecution, the court must instruct the jurors sua sponte to distrust his testimony. [Citations.] When, by contrast, he is called by the defendant, the instruction should be given only at the defendant's request. [Citations.] Finally, when he is called by both parties, the instruction should be tailored to relate only to his testimony on behalf of the prosecution." (*Id*. at p. 1314.) But in *People v. Guiuan* (1998) 18 Cal.4th 558 (*Guiuan*), the court modified the *Williams* rule and held that a tailored instruction on accomplice corroboration should be given sua sponte "whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies" and this instructional duty "is applicable regardless which party called the accomplice." (*Id*. at p. 569, italics added.) Also, the *Guiuan* court directed "that the instruction concerning accomplice testimony should henceforth refer only to testimony that tends to incriminate the defendant," and "that the phrase 'care and caution' better articulates the proper approach to be taken by the jury to such evidence." (*Ibid*., fn. omitted.)

Federal courts have rejected a due process challenge to the giving of accomplice instructions where the accomplice testified as a defense witness. In *United States v. Tirouda* (2005) 394 F.3d 683 (*Tirouda*), the Ninth Circuit held that a properly formulated accomplice instruction may be given "whether [an accomplice] testifies for the prosecution or the defense." (*Id*. at p. 687.) Also, informing the jury an accomplice's testimony must be viewed with greater caution than other witnesses did not violate the defendant's federal constitutional due process rights. (*Id*. at pp. 687–688.) It explained, "An accomplice's testimony may be suspect, regardless of whether he testifies for the prosecution or the defense." (*Id*. at p. 687)

Thus, under *Guiuan* and *Tirouda*, legally correct accomplice instructions may be given when factually appropriate, even when the accomplices are called as defense witnesses. Accordingly, we reject Pedro's contention that giving accomplice instructions was legally impermissible and violated his constitutional rights because Jose and Pineda were called as defense witnesses.

**D. Accomplice instructions were factually warranted.**

We now turn to Pedro's claim that accomplice instructions were not applicable under the facts of the case because neither Jose's nor Pineda's testimony tended to incriminate him. We agree with respondent that this contention lacks merit.

"Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*People v. Fauber* (1992) 2 Cal.4th 792, 834.) Respondent persuasively argues that Jose incriminated himself and Pedro during his testimony. Jose admitted that after the fight with Rodriguez, Pedro drove away from the apartment he shared with Garza in the Izuzu. Jose admitted he was a passenger in this vehicle. A red SUV was used in the drive-by shooting and two people identified Pedro as the driver. Jose also admitted that he and Pedro stole a car and fled the country together within hours after the shooting occurred. A reasonable jury could find Jose's testimony incriminated both Jose and Pedro by corroborating the People's theory of motive, placing Pedro as the driver of the Izuzu shortly before the drive-by shooting and Jose as a passenger, and proving flight immediately following the shooting.

Determining if Pineda could be found by the jury to be an accomplice presents a closer question. The People did not proffer evidence directly linking Pineda to the drive-by shooting. Rather, it was Pineda who connected himself as a participant during his testimony when he testified that Barrios identified him as the shooter. Pineda testified that Barrios circulated rumors that Pineda was the shooter. Pineda said that he confronted Barrios at the jail because Barrios was telling people that Pineda was the shooter. Pineda also testified that gang members, including Puga's older brother, "had it out for us. They got hits on us for what happened." Pineda testified that he was "green lit" as a result of the drive-by shooting. From this testimony, a jury could reasonably infer that prior to trial Barrios told others that Pineda was one of the participants in the drive-by shooting. We, therefore, conclude there was sufficient evidence to support the giving of accomplice instructions with respect to Pineda.

**E. CALCRIM Nos. 301 and 334 are legally correct statements of the law and were not misleading, confusing or argumentative.**

We now turn to Pedro's challenge to the specific language of the accomplice instructions. Pedro argues CALCRIM No. 301 was legally incorrect because it stated the testimony of an accomplice requires supporting evidence, without specifying that only incriminatory testimony requires corroboration. He contends that the jurors would infer from CALCRIM No. 301 that all of their testimony should be viewed with caution. We are not convinced.

"We must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. [Citations.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) We do not focus on whether a particular meaning can be teased out of an instruction by a convoluted reasoning process. Rather, we reasonably interpret the instruction in light of the entire jury charge. (See, e.g., *People v. Avena* (1996) 13 Cal.4th 394, 416–417; *People v. Kelly* (1992) 1 Cal.4th 495, 525–527.) Thus, CALCRIM No. 301 cannot be considered in isolation from the rest of the jury charge. CALCRIM No. 334 unequivocally instructed that the "statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution." (CALCRIM No. 334, italics added.) It is not reasonably likely that the jury misapplied CALCRIM No. 301 to require supporting evidence before any of Jose's or Pineda's testimony could be used to prove a fact. Reasonably read, the accomplice instructions adequately informed the jurors that only

incriminatory testimony of an accomplice must be corroborated. Jurors would not have understood CALCRIM No. 301 in the manner urged by Pedro.

Furthermore, we do not find the accomplice instructions confusing or argumentative. The jurors would have understood from CALJIC No. 301 the general principle that the testimony of a single witness is sufficient to prove a disputed fact, with the exception of accomplice testimony which requires corroboration. It then would have understood from CALCRIM No. 334 the specific perimeters of the accomplice corroboration rule. There was nothing confusing or contradictory in CALCRIM No. 301 and CALCRIM No. 334. Also, the instructions were not argumentative or partisan. CALCRIM No. 301 and CALCRIM No. 334 neutrally set forth the accomplice corroboration rule in a manner that did not favor either party.

Having rejected all of the challenges to the accomplice instructions, it follows that these instructions did not infringe any of appellants' constitutional rights. The cases cited by Pedro are not analogous because none of them dealt with legally correct instructions on accomplice liability. The rule requiring corroboration of inculpatory accomplice testimony is not constitutionally infirm and protects non-testifying codefendants. (*Guiuan, supra*, 18 Cal.4th at p. 568; *Tirouda, supra*, 394 U .S. F.3d at p. 687.) Accordingly, we hold the accomplice instructions were factually applicable in this case, were legally correct, and did not infringe any of appellants' state or federal constitutional protections.

**F. The alleged error is harmless.**

Assuming for purposes of this discussion only that CALCRIM No. 301 should have been modified, the instructional error was undoubtedly harmless even if we apply the stringent *Chapman* standard. (*Chapman, supra*, 386 U.S. at p. 24.) As we will explain, the instruction on accomplice liability did not play any part in the jury's verdict and, therefore, appellant was not prejudiced by the alleged instructional error.

The jury undoubtedly rejected Jose's testimony that he and Pedro did not commit the drive-by shooting because it was unworthy of belief, not because of any error in the accomplice instructions. Jose's claim that two young gang members who he barely knew were so enraged by the attack on Pedro and Jose, that they jumped into the Izuzu and committed the drive-by shooting was entirely unbelievable. Jose did not know the real names or addresses of Sapo and Sporty. No other testimony or inference from any trial evidence suggested that Sapo and Sporty even existed, much less that they committed the drive-by shooting. We agree with respondent that Jose's testimony that he and Pedro "would not retaliate immediately for the severe beating they received did not match who they were or the gang culture in which they lived. That they would flee immediately and go all the way to Canada because they were innocent was not credible. The eyewitness testimony was compelling, especially so since, just before Pedro fired, people outside the apartments commented that those were the guys that had stabbed Rodriguez and Ayon."

In addition, Pineda's testimony was not likely to have had any importance to the verdicts. Pineda did not provide Jose or Pedro with an alibi, corroborate Jose's claim that Sapo and Sporty drove off in the Izuzu immediately prior to the drive-by shooting, identify anyone else as the perpetrators or admit any involvement in the attack. No evidence was proffered to support Pineda's testimony that Barrios spread rumors that he was one of the perpetrators. On the other hand, Pineda did not directly incriminate appellants. Therefore, there is no chance that the accomplice instructions impacted the jury's consideration of Pineda's testimony.

24

1

2

    Finally, during closing arguments the prosecutor did not misstate the law of accomplice liability or erroneously argue that because Jose and/or Pineda were accomplices, all of their testimony was required to be corroborated.

3

    For all of these reasons, we conclude it is not reasonably possible that the allegedly erroneous instruction on accomplice liability contributed to the verdict. Thus, the alleged error is harmless beyond a reasonable doubt.

4

5 (LD 64.)

6    As previously stated, an allegation that a jury instruction is incorrect under state law does not

7 form a basis for federal habeas corpus relief. <u>Estelle</u>, 502 U.S. at 67. Rather, a habeas court must

8 consider "'whether the ailing instruction by itself so infected the entire trial that the resulting

9 conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or

10 even universally condemned.'" <u>Henderson</u>, 431 U.S. at 154 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141,

11 146-47 (1973); <u>California v. Roy</u>, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury

12 instructions is reviewed under the standard in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) -

13 whether the error had a substantial and injurious effect or influence in determining the jury's verdict.).

14 The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a

15 collateral attack on the constitutional validity of a state court's judgment is even greater than the

16 showing required to establish plain error on direct appeal." <u>Id</u>.

17    In this case, the state court reasonably rejected Petitioner's argument that the instructions

18 shifted the burden of proof or interfered with his right to testify. Petitioner alleges CALCRIM No.

19 301 was legally incorrect because it caused the jury to view all accomplice testimony with caution. "It

20 is well established that the instruction 'may not be judged in artificial isolation,' but must be

21 considered in the context of the instructions as a whole and the trial record." <u>Estelle</u>, 502 U.S. at 72

22 (quoting <u>Cupp v. Naughten</u>, *supra*, 414 U.S. at 147). As noted by the state court, CALCRIM No. 331

23 first informed the jury that the testimony of a single witness is sufficient to prove a disputed fact, with

24 the exception of accomplice testimony which requires corroboration. The jury was then instructed on

25 accomplice testimony with CALCRIM No. 334, which unequivocally instructed that the "statement or

26 testimony of an accomplice that tends to incriminate the defendant should be viewed with caution."

27 The state court reasonably found that the instructions were legally correct and not confusing.

28    Moreover, the state court reasonably determined that any error was harmless. The evidence of

1   Petitioner's guilt was strong.  Eyewitnesses testified that Petitioner and his co-defendant committed

2   the crimes.  In addition, Petitioner and his co-defendant immediately fled to Canada after the crime

3   was committed.  Petitioner's alibi testimony was not credible and was surely rejected as such by the

4   jury regardless of the accomplice instructions.   Accordingly, Petitioner fails to demonstrate that the

5   state court rejection of his claim was contrary to, or an unreasonable application of, Supreme Court

6   authority.  The claim should be denied.

7           E.  Cumulative Error

8           In his final claim for relief, Petitioner alleges his due process rights were violated due to

9   cumulative error.

10          A defendant may prove that he has suffered prejudice based on the cumulative effect of errors.

11  Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory evidence

12  suppressed by state is sufficiently material to violate Due Process Clause, court is required to assess

13  "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only conducts

14  piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S. 432, 435-36

15  (1995) (accepting lower court's assumption that "confusion arising out of a trial court instruction

16  about the state of mind necessary for conviction combined with a related statement by a prosecutor"

17  required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182 F.3d 699, 704

18  (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the extent that his

19  conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir.1978)

20  (concluding cumulative effect of alleged errors may demonstrate prejudice).

21          In this case, however, none of the claims raised by Petitioner have merit.  Accordingly,

22  Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

23  there are no errors affecting the verdict to accumulate. United States v. Jeremiah, 493 F.3d 1042, 1047

24  (9th Cir.2007).  The claim should be rejected.

25                          **RECOMMENDATION**

26          Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

27  PREJUDICE.

28          This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

                                    26

States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **October 7, 2013**                    **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE